Arguments not to exceed 15 minutes per side. Mr. Taylor for the appellate. Please. May it please the court counsel. My name is Chris Taylor. I represent Miss Linda King in this action. I would ask for This case is before the court because of a summary judgment ruling that was handed down by the district court. It's the plaintiff's contention. The summary judgment was erroneously granted in this particular case. And that Miss King should have her opportunity to have her case presented before the jury. Factually, Miss King worked as a claims coordinator for 18 years at AutoZone. And there is no dispute as to her ability to perform her job in a competent fashion. And there was no questions with regard to her and abilities. In January 2013, a gentleman by the name of Chris Brown took over and risk management. Despite having no experience in the risk management department. Clearly an at will employee. I think yes, your honor, she would be considered an at will employee. However, the fact is that I'm sorry. The problem you've got here is if she's an at will employee. And the company decides that it's going to completely revamp the department that she's in. Where she does not any longer have the experience that they're looking for. Then they could discharge her. So you've got to overcome that. Yes, your honor. And the mere fact that she is an at will employee does not give the employer the ability to discriminate. And it is our position that in this particular instance that's exactly what happened. The decision maker in this case, Chris Brown, came in. And in six months of his taking over their position. Determined that he would not. That he was going to reorganize. And his decision to make reorganizations within the risk management department at AutoZone. Was to affect three black females. But it didn't. It only affected one, right? Well, it actually, no, your honor. It actually affected all three. Because the other two were placed on performance, on PIP. Performance improvement plans. Despite. Is that an adverse employment action? Well, yes, your honor. And I will contend that it is. Because of what it led to. Because of the fact that Ms. Crystal Hubbard had been placed on a PIP. She determined that at that point she felt she was targeted. She felt that she was going to be let go. And so she voluntarily stepped down from her position to take a lower position. And after doing so resigned before she felt that she would be terminated. And Frances Littlejohn whose affidavit had also been presented. In that case she had never been counseled with regard to any disciplinary actions. And in fact had not been informed that she was having any kind of performance issues. At all until after he took over and provided her with the PIP. She decided to take early retirement instead of suffering any further disciplinary actions. With regard to Mr. Brown. So in fact all three of them were impacted. Now Ms. King lost her job. She lost her job to, it is the plaintiff's contention, Max Mosley. Who applied for the job that he applied for in September of 2013. Now the defendant in this case would assert that Mr. Mosley and Ms. King are not similarly situated. And that is the position that the district court adopted. Mr. Mosley at the time of the reorganization. And when Ms. King, you know, some of those duties were removed from her and put elsewhere. He wasn't even an employee at that point was he? He was not your honor. But the position had been posted and he ultimately replaced Ms. King in that position. Now the defendant says that he had higher or different responsibilities. But as I submitted as part of my exhibits to my statement, response to their statement of material facts. Was that Mr. Mosley's evaluation was largely that of the CARB report. He was evaluated and his evaluation speaks of his responsibilities in association with his preparation of the CARB report. Which was one of the main functions that Ms. King performed in her job as claims coordinator. And so, you know, the case law is such that you do not have to show that you're, to show similarly situated. That the responsibilities are identical. But that they were largely the same. And in this instance, that's exactly what we had. Mr. Mosley. To show just a pretext situation where the revamping of the department's function and the way it was dealt with. Is a pretext for her discharge? Well, your honor, I would submit that pretext was shown and shown in the record. That this was not their original reason. But that in fact that. This should go under the McDonnell Douglas dynamic? Yes, your honor. I believe so. And I believe she's met every prong of McDonnell Douglas. And I believe she's also shown that, been able to demonstrate that pretext exists in this case. Again, largely you can't look at this case without looking at the decision maker. Unfortunately, well fortunately, racism is not as overt as maybe it has been in the past. And so you have to look at the actions of the decision makers. And in this particular case, it was just very interesting that the decision maker in this case, Mr. Brown. Chose and admitted in his deposition that when he did this reorganization, it did not impact anyone but black females over the age of 40. And so in this case, certainly a prima facie case has existed. Certainly pretext exists. And a jury should have the opportunity to hear Ms. King's evidence and make a decision. Because ultimately, that's what we're hearing. We're not saying, you know, that we absolutely win this case. But we're saying that there are genuine issues of material fact that exist as to whether or not there was racial animus. There was age discrimination in this case. And a jury should have the opportunity to hear this case. And so, you know, well. That's the bottom line. It is. And I guess I have some remaining time. And I asked that it be added on to my five minutes that I requested. And I won't be the, I'm sorry. Let me ask you. What are you contending is before us on appeal. The district court, I guess, concluded that you, that your client abandoned the sex discrimination claim and the retaliation claim. And that, I guess, the court below is claiming that some of the claims you originally brought were waived and not continued to be argued. What, and initially the claims were race, age, retaliation, where gender was not alleged in your EEOC complaint. What claims are you saying is still before us on appeal here? Well, while I do believe the facts support a claim of sex discrimination. I have to candidly acknowledge that when my client filed her charge of discrimination, she did not include sex there. And so, therefore, I did acknowledge that before the district court. And so, I'm not alleging sex discrimination before the court of appeals. I do dispute that the plaintiffs abandoned its retaliation claim in its response to the motion for summary judgment. Specifically, we devote a section in our response to the motion for summary judgment to the retaliation. And the fact that Ms. King had complained of a prior supervisor and her treatment that she had to endure. And how unfair that treatment was. And that she continued to go up the chain of command with regard to the complaints on that supervisor. And ultimately, she got to someone and said, I, you know, I'm going to have to seek legal action if nothing is done about this supervisor. And she was, the supervisor was ultimately let go. But Ms. King felt that after that, there was significant pressure on her. Specifically, by Chris Brown's supervisor who put him in the job, Mr. Steve Buesink. Who was responsible for the reorganization that ultimately led to her losing her job. And so, that was pointed out in our briefing. And we did not abandon the retaliation claim. And it is the plaintiff's position that the district court erred in finding so. All right, thank you. Good morning, your honors. Excuse me, may it please the court. Gary Peoples for the defendant, Napa Lee. Autos owners first to address Judge Clay's question. This is a very narrow case. There are only two issues that are directly before the court. The first issue is whether the plaintiff at the summary judgment stage abandoned her retaliation claim. The second issue is whether she made a prima facie case of either age or race discrimination under the McDonnell-Douglas burden shifting standard that the court knows so well. There's also a third issue which the court could take up if it's inclined. It doesn't have to. But that was submitted in Autos Own's briefs at summary judgment and before this court with respect to pretext. There's just been no showing whatsoever of pretext in the way that the law actually requires. Can you tell me, how would you characterize the difference in this old department, what they did in connection with Autos Own's business? What the new department did and how that changed under Brown's leadership? That's an excellent question and it's somewhat opaque from the briefs because we didn't get into the weeds on the functions of the department. So Autos Own, as the court knows, is a very large corporation. And like many large corporations, it's almost totally self-insured. So what that means is as part of that self-insurance, Autos Own handles virtually all of its insurance work, loss work, in-house. Does it have a lot of insurance loss work? And where does that proceed from? Why does it have so much insurance loss work? The reason for that, Judge Merritt, there are two reasons actually. One is Autos Own operates thousands of retail stores across the country. So as you might imagine, there are a fair number of slip and fall claims and those sorts of things. Also, Autos Own, as part of its efforts to sell to commercial customers like auto shops and what have you, has thousands of vehicles in its fleets. It also operates a fleet of tractor trailers to deliver parts from distribution centers to retail stores. So as you might imagine, with thousands of drivers around the country driving Autos Own-owned vehicles, there are either accidents where Autos Own drivers are at fault or where other drivers are at fault. And part of the function of this risk management department is to process those claims pre-litigation. Before the Brown change, what was the function of that department? The department's function was the same. The insurance and loss management component with respect to Autos Own's operations has never changed and likely never will unless insurance changes in some way that I can't conceive of. What happened was, with the background facts that your honors need to know, is that the prior supervisor about which Ms. King, we assumed for the purposes of summary judgment, we didn't actually have any evidence other than her say-so, but we said that's enough. We said district court, assuming that she complained about this former supervisor, a woman named Carmen Haskell, who by all accounts was a pretty terrible supervisor. Haskell left the company. Haskell was investigated, received some discipline, and left the company in April of 2012. Well, as you can imagine, a management style like that was terrible for morale and was terrible for the numbers in the department. This may answer your question, Judge Merritt, which is that the risk management department, its overall function, if you had to sum it up in one sentence, is to lower the total cost of risk to Autos Own. One of the ways you do that is by processing claims more quickly, resolving them more efficiently, resolving them for less money. When Brown came on board, and Brown, of course, was an internal promotion. He has a background not in risk management but in accounting and analytics and has an MBA. So he was an internal promotion. He took the job of risk management manager in January of 2013. Now in that time period between Haskell's departure and Brown's getting the job, the interim head of the department was the person identified by Mr. Taylor, Steve Busink. So when Brown was brought on board, he inherited a department that had awful morale, was in, frankly, sorry shape. So the department was structured such that their general liability claim... It had been poorly run in the past. Correct, because of Haskell's management style. Correct, correct. So he inherited a department that was in bad shape, and part of his mission and part of the reason he was brought on was to bring his experience with analytics and other methods of promoting efficiency to bear on that department. Because Haskell had been abusing employees. She hadn't been pushing employees in ways to close claims efficiently. Some of this is outside of the record, but if you go back and look at Busink's deposition testimony, which is in the record, and Brown's deposition testimony, it's very clear that the department was in bad shape when he came on board. So as part of him being brought on board, he wanted to develop a plan to get the department into better shape. And part of getting the department into better shape was doing more data analysis. The data analysis is key for the department because unless you're measuring the claim history, the claim life, the amount you're paying out on those claims, you have no way of knowing whether you're bringing down the total cost of risk to AutoZone, if that answers your question. So in any event... How did she fail exactly? Well, Ms. King really had no part in that overall mission in the sense that her job was virtually entirely clerical. So she worked underneath an employee named Sheree McCleary. So Ms. King's job, about 35% to 40% of her job, was compiling a single report, which is an Excel spreadsheet, called the CARB report. And CARB is short for Corporate Accident Review Board. And that sounds as boring as it is. What happens is each week, AutoZone has a group of managers who meet and they go over the previous week's accidents involving AutoZone's vehicles. So about 35% to 40% of Ms. King's job, in her own estimation, was the preparation of this report. And the way she prepared that report, among other things, was she'd go request motor vehicle records for the drivers who were involved in these accidents. She would copy and paste that information into a spreadsheet. And basically she would spend about two days a week compiling all this information manually into a spreadsheet and then offering that up at the CARB report meeting that was held weekly and is still held weekly. And the rest of her job was basically a hodgepodge of clerical stuff. She printed key chains and decals. She printed FedEx labels. She answered the telephone. And another thing that the court may have gleaned from the briefs, although perhaps not because I didn't make the point terribly clearly, there's another employee named Sharon Berry whose title, she's still with AutoZone and she was with AutoZone during this time period as well. She's African-American. She's over 40. Obviously a woman. Her title is Risk Management Coordinator. And there was significant overlap between the clerical tasks that Ms. Berry did as part of her job and Ms. King did as part of her job. So the reasons why Ms. King's position in particular was identified for elimination are sort of the interrelation of the increased emphasis on analytics, which is the reason why the position Max Mosley ultimately felt was created. Because a woman named Misty Dosey was essentially the only analyst in the department when Brown came on board. And Misty Dosey was tasked with creating these queries and these reports to analyze the cost of risk. But she was overwhelmed and she wanted help, which was what prompted Chris Brown and others to create the position of Associate Risk Analyst to bring someone in who could perform those analytical functions to support the overall mission of AutoZone's Risk Management Department. And was that the position that Max Mosley filled? Yes, Judge. What role did that job entail? That job, so Mr. Taylor is correct. Max Mosley eventually took over the CARB report. It took Ms. King two days to prepare it, according to her own testimony and her deposition. It takes him two hours. He does about 30 other separate reports that involve various analytics. And I won't bore the court with all of them, but one of the main ones is something called the Lost Development Triangle. And what that does is that, excuse me, Your Honor, what that does is that tracks the value of a loss over time. And other reports that he generates and uses are in that sort of same general nature. Does he print key chains? He does not. Does he do any of those kinds of clerical things? Your Honor, the answer to that question can be best summed up by the fact that when Ms. King's position was eliminated, her immediate superior, supervisor, a woman named Cherie McClary, who is over 40, she took over most of Ms. King's job responsibilities and has retained most of those job responsibilities except for the CARB report, which Mr. Mosley now prepares. So that's why those are, I mean, I've gone through all the facts, but those are the reasons why Ms. King couldn't show that she was replaced within the way that the law in this area requires. She could also, she could have tried to have shown that someone who had a job like hers, who was similarly situated, who was not in those protected classes, age and race, because the retail claim and the sex discrimination claims are gone, and I won't talk about those because those are fully addressed in our appellate brief. She could have offered up other comparator evidence, but she didn't. The only potential comparator she offered up was Mosley, but of course there are several problems with that. One is Mosley's not her replacement, so he's not similarly situated in the sense that he's doing substantively different work. He's doing analytical work. She did clerical work in AutoZone's view. The second reason why is because when her position was eliminated, he hadn't even started working for AutoZone. So a plaintiff could have gone back within her department and looked for an employee who had a position similar to hers, but who was not let go. But had she done so, and as I mentioned before, the employee whose work is most similar to plaintiff's is also an African-American woman over 40 named Sharon Berry, who does much of the same clerical tasks, has a similar title. Her title is Risk Management Coordinator. So that comparator evidence likely wouldn't have helped plaintiff. And then if your honors have no more questions, I'll just say there's really no evidence of pretext. If you go through the briefs, or excuse me, if you go through the appellant's brief, you'll see that much of that, I guess, so-called pretext evidence, although we don't even have to reach that question given the posture of this case, most of that pretext evidence is, I guess, aimed at attacking the credentials of Chris Brown, who was the risk manager who took over and created the plan of reorganization and eliminated Ms. King's position. And then other parts of it are, I suppose, devoted to attacking the credentials of Max Mosley, the fellow who was brought in as the associate risk analyst. But, of course, those aren't profitable ways of showing pretext. To show pretext, you've got to show that AutoZone's stated reasons are insincere or phony, not that you disagree with the credentials of the decision maker or that AutoZone had a mistaken view of Ms. King's capabilities or what have you. And if that's all that I have, if you all have more, I'm happy to answer any questions. Do you have anything further to say about whether this retaliation claim was abandoned? I guess your opposing counsel claims that it wasn't. I do, Judge Clay. Well, first we need to keep in mind that a finding of abandonment is reviewed for abusive discretion. So Mr. Taylor, to prevail on that, would have to show that the district court made a very unreasonable mistake. And I'll quote from, so I'll say, to answer your question, Judge Clay, that AutoZone in our opening brief at summary judgment said, we'll assume that, of course, plaintiff suffered an adverse employment action. We'll assume for the purposes of summary judgment that she did engage in protected activity. But the fourth prong of a prima facie case of retaliation is, of course, some indicia of a causal connection between that protected activity and the subsequent adverse action. So here, in our opening brief at summary judgment, we identified two real problems with that, any showing of a causal connection by plaintiff, and said she couldn't make a showing of a causal connection. Those problems are this. First, the supervisor about which we assume that she had complained, Carmen Haskell, who by all accounts was a terrible supervisor, I'm not minimizing that. Carmen Haskell left the company for good in April of 2012. Chris Brown, who had no loyalty to Haskell, and in fact came from a different department, and who created this reorganization plan for the department, he didn't take over until January of 2013, didn't create the plan until June of 2013, and in fact plaintiff's position wasn't eliminated until September of 2013. So she has a real timing problem, and we said that in our opening brief. The second problem is that her theory of retaliation was just, it remains highly implausible, insofar as we offered record evidence at summary judgment, regarding AutoZone's investigation in 2011 of Haskell's management style, if you could call it that, mismanagement style perhaps. And in that record evidence that we offered, we offered up statements from employees who had been interviewed. These employees were all within the risk management department. They were interviewed by AutoZone's HR folks regarding Haskell. And as it turns out, plaintiff's name is nowhere on it, of course we assumed that away for summary judgment purposes, but there are a number of employees who are in protected classes who were on record complaining, and nothing, of course, happened to them, which renders her retaliation claim pretty well implausible. And to sum up, and I know it's a long answer, here's the only paragraph in her opposition brief summary judgment that addresses retaliation. And I'll quote it, because it's very short. Plaintiff complained of the chain of command about the treatment that she was receiving from Carmen Haskell. She testified that she complained to Steve Busing, who did nothing. Finally, she went to legal to let them know that if they did not do something about the treatment she was experiencing from Haskell, she would have to file a legal action. Steve Busing was involved in the decision to eliminate Ms. King's position. Certainly, her superiors were aware of her complaints. She testified that after Haskell's termination, she noticed significant tension in the department and apparent disdain from her from Steve Busing." So as you'll see in that response, it doesn't respond at all to the timing argument, and it doesn't respond at all to the plausibility argument. And I don't think the district court abuses discretion by deeming it abandoned. And if that's all the court has, that's all I have. Thank you. Thank you, counsel. Mr. Taylor-Rebuttal? Yes, Your Honor. As relates to attacking credentials, when speaking of pretext, plaintiffs are not attacking credentials. Plaintiffs are pointing out the motivations. Chris Brown's motivation seems fairly obvious in this case. He had the opportunity to come in and reorganize his department. And in doing so, I don't believe it was incidental that he decided that he would affect three African-American females over the age of 40. He did not take any other actions that affected anyone white within the department, anyone below the age of 40. As relates to Max Mosley, he is most certainly a comparator. Where they may not have given him the title of claims coordinator, his primary function when he came in, and if you look at his evaluation, what it pointed out and talked about was his handling of the CARB report. Ms. King's testimony in this case is that she had been consistently streamlining the process as relates to the CARB report. And so where he may have had it down to two hours now, she had gotten it down to five hours before she had left, and was continuing to come up with means and methods to do so. When he described in detail his responsibilities, Max Mosley, with regard to when he took over. And for the most part, he was trained with just handling basic claims, inputting stuff in the system about basic claims, coming to understand the basic claim process, things that Ms. King had been doing for 18 years. Now, when they talk about his responsibilities a year later, with regard to training he had received, there is nothing to indicate that Ms. King could not have done the same thing if given the opportunity. But in this case, Chris Brown did not give her the opportunity. In this case, Chris Brown downsized her and was in the process of eliminating two other black females' positions. And so most certainly, again, the plaintiffs point out that I may win or I may lose before a jury, but fact issues exist in this case. There are genuine issues of material fact that should allow this case to go before the jury. And I would ask his Honorable Court to find that there are genuine issues of material fact and remand the case back down to district court so that Ms. King can have her day in court. As it relates to the issue of retaliation, Steve Busink was over the risk management department before Chris Brown took over. Steve Busink was the one that Ms. King felt the animus from with regard to her complaints from Ms. Haskell. He had a relationship with Ms. Haskell. And according, Ms. King was not very happy at the fact that she was ultimately let go because of that relationship and I think held some kind of animus with regard to her. And so that was pointed out in our brief. We did not abandon that claim. And it is an abuse of discretion of the court to have found that there was abandonment when it was specifically addressed in the brief in this case. And so we would ask the court to find that the retaliation claim is viable and that pretext does exist or evidence of pretext. And so I thank the court. And if there are no other questions, I have nothing else. We have none. Thank you. Counsel, the case will be submitted. There will be nothing further to come before the court this morning. It is still morning. You may adjourn the hearing.